UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RUTH ANN WINTER,

                Plaintiff,                        Civil Action No. 2:12-11962

       v.                                  District Judge Paul D. Borman
                                                Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION TO**
**DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [9] AND**
**GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [12]**

      Plaintiff Ruth Winter worked at a window factory until she was 54 years old. She now suffers from an occasional irregular heart beat and low-back pain. Winter maintains that these impairments preclude her from working; accordingly, she applied for social security benefits. An Administrative Law Judge, acting on behalf of the Defendant Commissioner of Social Security, denied Winter's application. She now appeals that decision. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 9, 12). For the reasons set forth below, this Court finds that the ALJ did not commit reversible error in concluding that Winter's heart condition was not a "severe" impairment or in evaluating the records of Winter's treating physician. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 9) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 12) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## I. BACKGROUND

### A. Procedural History

In July 2008, Winter applied for disability insurance benefits and supplemental security income asserting that she became unable to work on September 30, 2007. (Tr. 11.) The Social Security Administration initially denied these applications in December 2008. (Tr. 11.) Plaintiff then requested an administrative hearing, and in May 2010, she appeared with counsel before Administrative Law Judge Andrew Sloss, who considered her case *de novo*. (Tr. 20-33.) In an August 24, 2010 decision, ALJ Sloss found that Winter was not disabled within the meaning of the Social Security Act. (*See* Tr. 11-16.) His decision became the final decision of the Commissioner of Social Security on March 12, 2012, when the Social Security Administration's Appeals Council denied Winter's request for review. (Tr. 1.) Plaintiff filed this suit on May 1, 2012. (Dkt. 1, Compl.)

### B. Medical Evidence

In July 2004, Winter underwent testing for osteoporosis. (Tr. 185.) Her lumbar spine bone mass put her at a 30 percent risk of a fracture during her lifetime. The radiologist's impression was "osteopenia in the [lumbar]-spine and [right] hip." (*Id.*)

On June 30, 2008, when Winter was 55 years old, she went to see Dr. Paul Scaddan, apparently her primary-care physician, for a "routine follow up." (Tr. 148, 150.) She had last seen Dr. Scaddan in October 2007. (Tr. 150.) Dr. Scaddan's exam revealed an elevated heart rate; more specifically, "atrial fibrillation with a rapid ventricular response of 130s-140s." (Tr. 148.) Winter, however, was otherwise "asymptomatic," and she specifically denied chest pain, shortness of breath, and palpitations. (Tr. 150.) Although she admitted to feeling fatigued, "this [was] old for her[;] [t]his [was] not anything beyond which [was] normal for her." (Tr. 150.)

2

Dr. Scaddan admitted Winter to the hospital. (Tr. 148, 150.) An echocardiogram indicated "no evidence of any thrombus," a "slightly" dilated left ventricle, and a "slightly low" ejection fraction. (Tr. 148.) A carotid ultrasound showed no significant stenosis, but Dr. Scaddan noted "some long stringy plaques consistent with smoking." (Tr. 148.) Winter was then smoking a pack of cigarettes per day. (Tr. 150.) She also had a "history of hypertension," which had been difficult to control due to Winter's intolerance to various medications. (Tr. 150.) Dr. Scaddan discharged Winter with an increased dose of Cardizem, her regular dose of Dyazide, Lovenox shots, and Coumadin. (Tr. 148.)

At her follow up with Dr. Scaddan on July 8, 2008, Winter reported that she was "feeling well." (Tr. 164.) She denied chest pain, shortness of breath, and palpitations. (*Id.*)

In November 2008, Dr. R. Scott Lazzara examined Winter for Michigan's Disability Determination Service. (Tr. 195-99.) Dr. Lazzara noted a history of tachycardia in 2007 that was treated with a catheter ablation technique. (*See* Tr. 195.) Winter told Dr. Lazzara that she still felt fatigue, but not as severe as in 2007. (*Id.*) She also reported back pain due to her work at the factory. (*Id.*) Winter said that the pain would occasionally radiate down her right leg, but that she was not receiving any treatment. (*Id.*) On exam, Dr. Lazzara found that Winter's spine had a 30 degree thoracic kyphosis, i.e., hunchback. (Tr. 196.) Dr. Lazzara also noted tenderness over the L4-L5 and L5-S1 facet joints on the right side. (*Id.*) Winter had a full range of spinal motion, however. (*Id.*) Dr. Lazzara concluded, "At this point, posture mechanics training, anti-inflammatories, and conditioning would be of benefit. There was no myopathy or neuropathy today. Her gait was stable." (Tr. 198.) Regarding her heart condition, Dr. Lazzara noted, "The patient was in regular rhythm today. There were no findings of heart failure. She did have some findings of emphysema which may be

3

explaining her fatigue as she is not on inhaler therapy." (Tr. 199.)

In December 2008, Winter saw Dr. Scaddan for left, lower-back pain. (Tr. 219.) Dr. Scaddan noted a long history of back pain, but that it was "much better today." (*Id.*) On exam, he found that Winter had sacroilliac tenderness, left greater than right. (*Id.*) His assessment included lumbosacral spasm and sacroililtis on the left. (*Id.*) Dr. Scaddan prescribed Tylenol, ice, heat, massage, and back exercises. (*Id.*) Although his handwriting is difficult to decipher, Dr. Scaddan appears to have also noted atrial fibrillation, something about another physician, and something about a Holter monitor (a device that records heart rhythms). (Tr. 219.)

Later that month, Dr. Claire Issa reviewed Winter's medical file and completed a physical residual functional capacity assessment of Winter on behalf of the Social Security Administration. (Tr. 201-08.) Dr. Issa believed that Winter could lift 20 pounds "occasionally," 10 pounds "frequently," stand or walk for six hours in an eight-hour day, and sit for six hours in an eight-hour day. (Tr. 202.)

In January 2009, an imaging study of Winter's lumbar spine was performed. (Tr. 220.) The radiologist's impression was mild dextroscoliosis, right facet arthritis at the L5-S1 joint, marginal osteophytic spurring from the L3 and L4 vertebrae. (Tr. 220.) It also revealed atheromatous vascular calcification. (*Id.*)

Later that month, Dr. Scaddan provided Winter with a spinal injection for her back pain. (Tr. 221.)

In May 2009, Winter returned to Dr. Scaddan with complaints of back pain. (Tr. 222.) Dr. Scaddan noted that Winter was "interested" in medication. (*Id.*) Dr. Scaddan's exam revealed sacroilliac tenderness; he assessed lumbosacral spasm and osteoarthritis of the lumbosacral spine.

4

(Tr. 222.) Dr. Scaddan prescribed Darvocet, a short-term opiod. (Tr. 222.)

Winter next saw Dr. Scaddan in October 2009. (Tr. 225.) The purpose of the visit was to review Winter's recent laboratory testing. (*Id.*) Dr. Scaddan noted that Winter felt "ok." (*Id.*) Winter denied chest pains, shortness of breath, or palpitations. (*Id.*) She was still experiencing back pain, however, and, although Dr. Scaddan's handwritten notes are again difficult to read, it seems that Winter was to see a "Dr. Jilani" for that condition. (*Id.*)

### C. Testimony at the Hearing Before the ALJ

At her administrative hearing before ALJ Sloss, Winter began by testifying about her past work. (Tr. 23.) She explained that her first job at the window factory involved taking 10- to 15-pound windows from a machine and "then bend[ing] over [to] pack them into a box." (Tr. 24.) Later, Winter was given a "sit-down job" where she took "little parts out of a machine," "looked to see if there were anything wrong with them," and then "pack[ed] them in a small box." (24-25.) Winter stated that this inspector job allowed her to "stand or sit, whatever you wanted to do." (Tr. 25.)

Winter testified to her back pain. She stated that she had "pain everyday" and that if she stood "too long" her back would "really start[] hurting." (Tr. 25.) The pain sometimes even radiated to her chest: "It feels like I'm having a heart attack." (*Id.*) Winter provided that her back pain was "[u]sually pretty good at night, but I do wake up from my back pain." (Tr. 30.)

Regarding her heart condition, Winter told the ALJ that her heart "was beating like 270 a minute where yours beats like 70 a minute, and they put me in the hospital, then I had to have my heart zapped." (Tr. 27.) When the ALJ asked if she had ongoing symptoms from her heart condition, or whether it was "just the one . . . instance," Winter replied, "I've had heart trouble. It runs in my family, but I've had it, but I think he might have it under control right now, the beating part." (Tr.

5

27.)

In terms of functioning, Winter stated that she could sit for 10 to 15 minutes before needing to stand, but that she could not "stand for a long time either." (Tr. 28.) "I'm up and down all the time." (*Id.*) Winter said that the most she lifted during the day was "five pounds maybe." (Tr. 28.) She also provided that she had to lie down three times a week. (Tr. 29.) Although it is unclear whether the cause was back pain or fatigue, Winter provided that she could not do her housework or cook meals without taking breaks: "I take a lot of breaks." (Tr. 27.)

After Winter testified, the ALJ asked a vocational expert about job availability for a hypothetical individual of Winter's age (then 57 years old), education (high school), and work experience who was capable of "light" work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), but who could only "frequently" balance, and only "occasionally" climb, stoop, crouch, kneel, or crawl. (Tr. 31.) The vocational expert provided that this hypothetical individual could perform both of Winter's window-factory jobs: the window packing position was "light" and "unskilled" work, while the second inspector-type position was "sedentary," "unskilled" work. (Tr. 31.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the

6

application of a five-step sequential analysis:

>1. If claimant is doing substantial gainful activity, he is not disabled.
>
>2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
>3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
>4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
>5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Sloss found that Winter had not engaged in substantial gainful activity since the alleged disability onset date of September 30, 2007. (Tr. 11.) At step two, he found that Winter had the following severe impairments: degenerative disc disease. (Tr. 13.) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 14.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform "light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant can only occasionally climb, stoop, crouch, kneel and crawl. She can frequently balance." (Tr. 14.) At step four, the ALJ found that Winter was able to perform her

7

past relevant work as a packer (light and unskilled) and production worker (sedentary and unskilled). (Tr. 16.) The ALJ therefore concluded that Winter was not disabled as defined by the Social Security Act from the alleged onset date through the date of his decision, August 24, 2010. (Tr. 16.)

### III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*,

499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683

(6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been

cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence

in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir.

2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide

questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV.  ANALYSIS

Plaintiff argues that remand for further analysis or fact finding is necessary because the ALJ

committed two significant errors. Plaintiff first says that the ALJ erred at step two of the five-step

disability analysis by finding that her heart condition was not a severe impairment; she further says

that this error was not harmless because the ALJ did not adequately account for that condition at

subsequent steps of the five-step disability analysis. (Dkt. 9, Pl.'s Mot. Summ. J. at 3-4; Dkt. 13,

Pl.'s Reply at 1-3.) Plaintiff next contends that the ALJ erred by failing to properly consider the

opinion and treatment records of her treating physician, Dr. Scaddan. (Pl.'s Mot. Summ. J. at 6-8.)

The Court will address these two claims of error in turn. Neither justifies remand.

### A. The ALJ Did Not Commit Reversible Error at Step Two

Plaintiff is correct that the Sixth Circuit has "characterized step two of the disability

determination process as a 'de minimis hurdle.'" *Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923,

929 (6th Cir. 2007) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). "[A]n impairment

can be considered not severe only if it is a slight abnormality that minimally affects work ability

regardless of age, education, and experience." *Higgs*, 880 F.2d at 862. Nonetheless, not every

9

impairment is severe: "The mere existence of . . . impairments . . . does not establish that [the claimant] was significantly limited from performing basic work activities for a continuous period of time." *Despins*, 257 F. App'x at 930.[1] Indeed, as the Sixth Circuit has previously noted, "albeit in an unpublished decision, '[w]hen doctors' reports contain no information regarding physical limitations or the intensity, frequency, and duration of pain associated with a condition, this court has regularly found substantial evidence to support a finding of no severe impairment.'" *Despins*, 257 F. App'x at 930 (quoting *Long v. Apfel*, 1 F. App'x 326, 331 (6th Cir. 2001)).

Under this standard, substantial evidence supports the ALJ's finding that Plaintiff's atrial fibrillation and supraventricular tachycardia were not "severe" impairments. Plaintiff provided that she had suffered from supraventricular tachycardia, but that it was surgically treated in 2007. (*See* Tr. 195 (evaluation notes stating that tachycardia was "ablated" in 2007 and that fatigue was "not as severe").) Although Plaintiff was later hospitalized after Dr. Scaddan discovered atrial fibrillation in June 2008, Plaintiff had not gone to see Dr. Scaddan for that condition or for symptoms from that condition; indeed, Dr. Scaddan explicitly noted that Plaintiff was "asymptomatic" and that her fatigue was normal for her. (Tr. 148, 150.) At her post-hospitalization follow-up with Dr. Scaddan in July 2008, Plaintiff reported doing well. (Tr. 164.) And, at her exam with Dr. Lazzara in November 2008, her heart rate was normal. (Tr. 199.) It appears that Plaintiff's heart problem did

---

[1] The Social Security Regulations define basic work activities as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). Examples include:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting.

*Id.*

10

not manifest again until December 2008 when Dr. Scaddan noted something about atrial fibrillation and a Holter monitor. (Tr. 219.) There are no reports of atrial fibrillation or any symptoms associated with Plaintiff's heart condition between December 2008 and the May 2010 hearing.

There is no dispute that Plaintiff has atrial fibrillation or supraventricular tachycardia. But nothing in the above summary indicates that Plaintiff ever had any symptoms beyond an irregular or rapid heartbeat. *Cf. Despins*, 257 F. App'x at 930. This was true even when her condition was severe enough for her to be hospitalized. Further, there are long gaps between reports or findings of fibrillation, including a six-month one in 2008 and a year-and-a-half void before the administrative hearing. In all, while one could reasonably reach a different conclusion, on this record, the ALJ's step two finding was reasonable. The Court therefore finds no error justifying remand. *See Mullen*, 800 F.2d at 545 (substantial evidence "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

Moreover, as Plaintiff also recognizes, even if the ALJ erred at step two, the error would not be harmful unless the ALJ's exclusion of atrial fibrillation as a severe impairment resulted in an inaccurate residual functional capacity assessment. (Pl.'s Mot. Summ. J. at 4-5.) *See also Swartz v. Barnhart*, 188 F. App'x 361, 368 (6th Cir. 2006) ("Even assuming that the ALJ erred by not including 'Borderline Intellectual Functioning' and 'Dependent Personality Disorder' as additional severe impairments in step two of its analysis, the error is harmless as long as the ALJ found at least one severe impairment and continued the sequential analysis and ultimately addressed all of the claimant's impairments in determining her residual functional capacity."); *Riepen v. Comm'r of Soc. Sec.*, 198 F. App'x 414, 415 (6th Cir. 2006). But, as noted, evidence of functional limitations

11

attributable to Plaintiff's heart condition is minimal. And even granting that Plaintiff experiences some fatigue due to her heart condition, the ALJ could still have reasonably found that Plaintiff's fatigue would not preclude her past "sedentary" work.[2]

**B. The ALJ Did Not Commit Reversible Error in Evaluating Dr. Scaddan's Records**

Plaintiff next relies on the treating-physician rule and associated case law to argue that the ALJ reversibly erred by failing "to indicate the weight given to the opinions and findings of Dr. Scaddan." (Pl.'s Mot. Summ. J. at 6-7.) In other words, Plaintiff suggests that the ALJ erred by failing to comply with the "treating-source rule," which generally requires an ALJ to defer to the opinion of a physician who has a "detailed, longitudinal picture" of the claimant's medical condition. *See, e.g.*, *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).

But the treating-source rule plays almost no role in this case. It is true that Dr. Scaddan's treatment notes appear in the record and, arguably, his diagnoses constitute "medical opinions." *See* 20 C.F.R. §§ 404.1527, 416.927(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), *including your symptoms, diagnosis and prognosis*, what you can still do despite impairment(s), and your physical or mental restrictions." (emphasis added)); *but see West v. Astrue*, No. 3:09-370, 2011 WL 825791, at *8 (E.D. Tenn. Jan. 19, 2011) ("Dr. Coffey's opinion that Plaintiff suffered from anxiety and depression was simply a conclusory diagnosis. It was not a judgment about the nature and severity of the diagnosed anxiety and depression."), *report*

---

[2]The Court recognizes that the ALJ's residual functional capacity assessment provides that Plaintiff can perform "light" work. But, as discussed in greater detail below, even if that was also error, the vocational expert testified that Plaintiff's factory job as an inspector was "sedentary" and the ALJ's step-four finding was that Plaintiff could return to that job. Thus, to be harmful error, it must be that Plaintiff's fatigue also precludes that particular sedentary work.

12

*and recommendation adopted*, 2011 WL 832470 (E.D. Tenn. Mar. 2, 2011); *Modesitt v. Astrue*, No. 09-0483, 2010 WL 3749290, at *8 (C.D. Cal. Sept. 21, 2010) ("Dr. Singh's treatment notes, while providing a diagnosis of major depressive disorder, most likely bipolar, and alcohol abuse, do not mention what Plaintiff can do despite her impairments or contain any consequent mental restrictions. . . . Accordingly, the treatment notes do not fit within the definition of a 'medical opinion' and the ALJ was not required to discuss them in his decision."). But Dr. Scaddan never opined on what he believed Winter could still do in view of her symptoms; in other words, he offered no opinion on his patient's ability to function. Accordingly, at steps three and four of the disability analysis, there was no treating-source opinion for the ALJ to defer.

In apparent recognition of this, Plaintiff also argues that the ALJ erred by failing to adequately address Dr. Scaddan's records. "Nowhere in the ALJ's decision," says Plaintiff, "does ALJ Sloss make any reference to the treating physician's office findings, notation of symptoms or diagnosis." (Pl.'s Mot. Summ. J. at 7.) Similarly, she claims that it is "inconceivable" that the ALJ fully considered the record in view of a narrative that "ignores the only treating physician and 50% of the physicians of record." (Pl.'s Reply at 3.)

Plaintiff's argument is overstated. It is true that the ALJ did not discuss every one of Dr. Scaddan's treatment notes. But the law did not require him to. *See Kornecky*, 167 F. App'x at 508. And ALJ Sloss did discuss some of Dr. Scaddan's records. The ALJ noted Plaintiff's June 2008 visit when Dr. Scaddan identified fibrillation. (Tr. 13.) He summarized the tests that Plaintiff received during her subsequent hospitalization when she was monitored by Dr. Scaddan. (Tr. 13-14.) He also noted Plaintiff's January 2009 x-rays of her lumbar spine (Tr. 14); Dr. Scaddan reviewed but did not comment upon those x-rays (Tr. 222 (merely noting "x-ray [reviewed or renewed] 1/14/9")).

True, the Court would have preferred the ALJ to have discussed Dr. Scaddan's December 2008, May 2009, and October 2009 treatment notes. But given the content of those records, the ALJ's failure to do so does not justify remand. In December 2008, Dr. Scaddan noted a long history of back pain, but that it was "much better today." (Tr. 219.) In May 2009, Dr. Scaddan provided Plaintiff with an injection for back pain. (Tr. 221.) The effectiveness of this shot is not reflected in Dr. Scaddan's treatment notes. As to the mere fact that Plaintiff received that treatment, the ALJ was informed about the shot at the hearing: "you've got some medication, and you've had some pain shots. Is there anything else that you do to try to get some relief from that pain?" (Tr. 29; *see also* Tr. 26 ("I had shots in my back.").) In October 2009, Plaintiff saw Dr. Scaddan to review laboratory results that appear to have no relation to her back pain; indeed, Plaintiff reported feeling "ok." (Tr. 225.) Further, it appears that Plaintiff began seeing a different physician for her back pain shortly after that visit. (Tr. 225.) In short, none of Dr. Scaddan's December 2008, May 2009, or October 2009 treatment notes are the kind of evidence that leads the Court to question whether the ALJ fully appreciated Plaintiff's impairments when he crafted her residual functional capacity assessment.

And even if the ALJ's picture of Plaintiff was somewhat incomplete, Plaintiff has not persuaded the Court that the ALJ's view of her resulted in prejudice. *See Shinseki v. Sanders*, 556 U.S. 396 (2009) (holding that the burden is on the party attacking the Department of Veterans Affairs' decision to prove that Department's error was not harmless); *McLeod v. Astrue*, 640 F.3d 881, 887 (9th Cir. 2010) (applying the holding in *Shinseki* to social security disability cases). As noted, the ALJ concluded at step four that Plaintiff could return to her past relevant work. That finding incorporates a "sedentary" job (lifting 10 pounds occasionally, sitting for six hours, and standing or walking for two hours, *see* 20 C.F.R. § 404.1567(a); S.S.R. 83-10, 1983 WL 31251, at

14

*5) where Plaintiff was able to sit or stand as she pleased. (Tr. 25.) Consistent with these demands, on her self-completed function report, Plaintiff provided that she could lift 10 pounds and that she could walk for 20 minutes before needing a rest. (Tr. 121.) Also consistent with the capacity for "sedentary" work with a sit-stand option is Plaintiff's testimony that she could sit for 15 minutes at a time but that she frequently alternated between sitting and standing throughout the day. (Tr. 28.) Dr. Issa, who offered the only medical opinion on Plaintiff's functional ability, believed that Plaintiff could even perform more demanding "light" work. (Tr. 202.) In all, this is substantial evidence supporting the ALJ's step-four finding. It follows that this Court should not disturb the ALJ's finding that Plaintiff was not disabled within the meaning of the Social Security Act.

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that the ALJ did not commit reversible error in concluding that Winter's heart condition was not a "severe" impairment or in evaluating the records of Winter's treating physician. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 9) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 12) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections,

but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson_____
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  June 21, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 21, 2013.

s/Jane Johnson_____
Deputy Clerk
